Good morning. This is very peculiar. You're on a phone now, but may it please the court. My name is Eitan Kaslyanich and I'm representing Cynthia McCloud in this appeal. Good morning, counsel. Good morning and good morning to all of you. I unfortunately had a Zoom problem, couldn't see anybody, so I guess I'll time this myself. Okay. McCloud is alleging disability since June 2008 due to the combined functional effects of several mental impairments. She was evaluated by three psychologists, Dr. Hapke, Dr. Bose, and Dr. Wingate, all of whom opined that she has many mental functional limitations. The ALJ erred by improperly rejecting all of these opinions. Now, in this case, I think the most important and the biggest error here involves the ALJ's handling of the opinions of Dr. Hapke and Dr. Bose. Dr. Bose evaluated McCloud twice, Dr. Hapke once. Dr. Hapke did testing that showed that she had, I mean, very severely impaired memory. And then he basically opined that she couldn't work. Dr. Bose evaluated her twice and noted many clinical findings that support her opinions, which were basically disabling opinions, opinions that she had so many marked impairments that it's quite obvious that would prevent somebody from sustaining employment. So I'm going to circle back to Dr. Hapke. I'm going to stay on Dr. Bose for a minute and point out that Dr. Bose, the ALJ only gave two reasons for rejecting Dr. Bose's opinion, and neither of those reasons withstand any kind of scrutiny. The first reason being supposedly she was unaware of McCloud's marijuana use, but this was something she had discussed in both of her evaluations. And the other reason was that she had, according to the ALJ, relied too much on the claimants' less than credible complaints. But once again, the ALJ didn't even mention or discuss any of Dr. Bose's clinical findings which fully support her opinion. Counsel, this is Judge Simon. I want to ask you about two of those clinical findings. First, in 2014, Dr. Bose found a mental status exam score of 23. Then in 2015, he had a mental status exam score of 24. I couldn't tell from the record. Can you explain to me whether that's going in a good direction or a bad direction? Does it show that it's 24 more severe or less severe than 23 for a mental status exam? 24 is less severe, but neither of those tell the whole story because a lot of the observations that Dr. Bose recorded and which I discussed in my brief are not things that necessarily go into that 30-point mental status exam score. There could be people with a score of 30, which is flawless, and yet they can still have problems that don't fit into the boxes that they use on that test. But between 23 and 24, I think most psychologists would say that that's an insignificant difference. It's within the margin of error almost. The other question I had related to the exams for Dr. Bose was that in 2015, Dr. Bose did the Beck Depression Inventory. Your client scored a 37, which is severely depressed. In 2014, they didn't do a Beck Depression Inventory. I think your client basically did not want to know. The reason is that that is actually one piece of evidence here that is fully within the control of the claimant. The Beck Depression Inventory is a questionnaire that's given to them and they just answer it. It's considered a subjective test, although it's used as a tool by psychologists to get an idea on what does the claimant say about themselves. A Beck Depression Inventory by itself is not going to be considered objective evidence. But when it's administered by a psychologist and it's considered to be valid, it's still really mostly a subjective test. But once again, it's used for confirming all the other objective observations. So, what is the most relevant objective observations by Dr. Bose that would account for the difference between 2014 and 2015? Well, once again, I think the difference between those two years is very insignificant. When if you look at, once again, the mental status examination, that one point score difference is not a meaningful difference. And in fact, in 2015, she rated her as being more severely impaired. And it's, once again, it's based on the observation that she described of the things she actually saw in looking at, as part of the whole interview process. And I've got to list these. Counsel, wouldn't that, doesn't that suggest that the ALJ was correct then, that she relied too much on her subjective complaints if the objective measures seem to be going one way better, but then her opinion was that it's more severe. So, doesn't that support the ALJ's conclusion? No, it doesn't. Because there really wasn't, it wasn't like she, the objective findings were improving. I mean, as an example, and I'm looking at, I think it's 537 in the transcript, 536 through 539 actually. But she reported so many observations, including the pressured speech, speech that wasn't well organized, difficulty sitting still, she was scattered, she was confrontational, defensive when asked to complete the BDI. She was fidgeting in a manic mood and showed no appropriate and congruent, showed, oh wait, excuse me. She showed an appropriate and congruent aspect to her manic mood. So, she was even looking manic. She showed an abnormal thought process, ideas of reference, paranoia, rumination, impaired short-term recall, inadequate funded knowledge, impaired concentration, she was unable to perform serial sevens, and she had limited insight and was impulsive. These are significant clinical findings. I seldom see this many. I'm sorry for jumping in and interrupting because your time is running short. I wanted you to heavily, it appears to me, on the inconsistencies between the objective testing and her own reporting. So, you know, I think as you pointed out, with those objective tests, another doctor could say that this is significant. Dr. Bose apparently did. Drs. Gilbert and Nelson then focused on the inconsistencies in the record. And so, the ALJ said, look, you know, there's Dr. Bose's opinion less weight because these inconsistencies were acknowledged by Drs. Gilbert and Nelson, but not acknowledged by Dr. Bose. So, how would you respond to that? Well, once again, I think it boils down to the many clinical observations she reported. And the other doctors, of course, have never met McLeod. They've never talked to her. All they've done is looked at paper. And part of the paper that they should have been looking at, I think they saw the first Dr. Bose report, but perhaps not the second. But if Dr. Bose had not recorded and all of those many clinical observations describing all these problems, then the state agency non-examiners would have more of a basis for saying, well, we see an inconsistency here. They don't explain how all those many clinical observations are inconsistent with her opinion. They're actually fully consistent with her opinion. And the last thing I wanted to point out is that Dr. Hapke's test results showing memory in the first percentile, that's huge. That's a massive problem. And yet, the ALJ doesn't address that either and why that would support his opinion as well. I would like to reserve any additional time I have, if I have any, for rebuttal. Yes, you've got 35 seconds. Can you see the clock? No, I can't. I actually was going to set my timer on my phone and I didn't. But I kind of knew I was running out of time. I appreciate it, counsel. You have 35 seconds, but I'll have the clerk put a minute on the clock when you come back. Thank you very much. Let's hear from Ms. Moon. Good morning. May it please the court, my name is Sarah Moon. So after the hearing in this case, McLeod acknowledged to a provider that she had not been forthright. I'm sorry, counsel, you're actually coming in and out and I'm having a hard time hearing you. I apologize. Okay, is this better? Go ahead. Is this better? Okay. Yes, it's better. Okay, thank you. May it please the court, my name is Sarah Moon, here representing the commissioner. After the hearing in this case, McLeod acknowledged to a provider that she had not told, quote, the honest proof, unquote, at the hearing. McLeod's admission that she had not been forthright is consistent with the ALJ's finding that her symptom allegations were not fully reliable, given numerous inconsistencies between her reports and the rest of the record, as well as evidence of only limited treatment and effective treatment. Because these same inconsistencies likewise undermine the lay of McLeod's subjective complaints before moving to the other issues. So in brief, the ALJ noted three areas of inconsistencies in discounting McLeod's substance abuse claims, the extent of her activities, her drug use, and her living situation and access to income. And rather than going through all of that evidence, I want to briefly address the argument McLeod makes in his reply brief, arguing that there are no actual inconsistencies given the timeframe of McLeod's reports and the activities in the record. So for example, McLeod attempts to delimit the timeframe of the reports and say that the ALJ only relied upon McLeod's reports at the 2015 hearing. But McLeod's allegations to the agency about the severity of her symptoms have been consistent. So at the beginning in her application materials and her function report in July of 2013, for example, she said she stays in bed all the time, is argumentative and easily irritable, and has no friends. And she made those same allegations in 2015. And not standing those consistent allegations, there's evidence during the period that she has friends, goes to the casino, goes to church, goes to the library, helps her husband with odd jobs, spends time with family, all of these activities. The same is true with regard to drug use. She told the ALJ that she hadn't used methamphetamine since 1980, or excuse me, she tested positive in 2008 and acknowledged use in 2008, and that acknowledgement was found at record page 350. The same is true with regard to her statements about her living situation. In her application materials, she said she was living alone, but that same month, she said she was living with family, and that she watched her husband do the shopping, which suggests that she's living with her husband. And subsequent evidence also demonstrates that she's living with her that was helping her and her husband in 2013 when she applied to accept housing. The ALJ also pointed to McLeod's treatment history, including her improvement with treatment and limited treatment, as well as the fact that McLeod's unemployment might be tied to other factors, including a criminal record that she believes was a barrier to employment. So having underlined the reasons that the ALJ gave to discount McLeod's conjectures and complaints, let's move to those medical opinions, and let's start with Dr. Bowe's opinion. Let me ask you this, counsel. With regard to Dr. Bowe's testimony, the ALJ rejected that, citing to the fact that it relied too much on self-reports. As we said in Buck v. Berryhill, psychiatric examinations are different, and the ALJ's, or a particular doctor's, partial reliance on self-reports is not, in and of itself, an adequate basis for rejecting the doctor's testimony. So why isn't that error in this case under the Buck case? So that's right. The court did acknowledge, in fact, that psychiatric diagnosis depended hard on a claimant's reported symptoms, and often those symptoms can't be confirmed. Often there's no x-ray or blood test to confirm, for example, a claimant's allegation that she has no symptoms. You broke up again. I didn't hear that last sentence. I'm so sorry. There is no x-ray or blood test to confirm a claimant's allegation, for example, that she's so irritable that she has no symptoms. But there are a couple of reasons that we can distinguish Buck. First, Buck held that partial reliance isn't sufficient to reject a psychological opinion that is based, in part, on an interview and psychological test. But there is other case law that says that heavy reliance is a valid reason to discount a psychological opinion that is based on subjective symptom complaint. We have that in Ghanem, as I cited in my brief, and we also have other cases like Morgan, cited by Buck, where the court has rejected psychological opinions because of heavy reliance on a claimant's subjective complaint. And that's what we have in this case. So as the court discussed in questioning, the findings between Dr. Bowe's 2014 opinion and 2015 opinion are remarkably similar. In fact, the mental status examination findings are almost exactly the same word for word. The clinical findings in Section D of the opinion are exactly the same. And in 2015, McLeod scored slightly better on the mini mental status exam. In 2014, she scored a 23, which is mild impairment. So the findings between the two opinions are very similar. Nonetheless, Dr. Bowe's assessed severe limitations in 2015 were also marked limitations in 2014. And when we look at the opinions, it's important to evaluate whether there's a through line between the severity of the assessed limitations and the evidence in the opinion versus the severity of the assessed limitations and the reports of the claimant. So, for example, in this case, Dr. Bowe's specifically acknowledged that McLeod engaged appropriately during interview. Nonetheless, she assessed marked limitations in communicating, maintaining appropriate workplace behavior. So there doesn't appear to be a through that Dr. Bowe's observed and noted in her report and the assessment. And instead, it appears that Dr. Bowe's assessment of limitations was based upon McLeod's reports that she avoids public places, can't get along with others, can only get along, quote, for a minute if she can get along. Or, for example, McLeod's report that she hadn't been living with her husband for 18 months because of mood variability, when that's simply untrue. Let me just ask you briefly, because in both the 2014 and 2015 report from Dr. Bowe's, Dr. Bowe's observed that Ms. McLeod used marijuana on and off most of her life and uses it most days. That's in both reports. Yet, the ALJ totally missed that. Shouldn't that give some pause that the ALJ was careful in reviewing Dr. Bowe's reports? So, I acknowledge that that finding doesn't appear to be supported by Dr. Bowe's. Dr. Bowe did note McLeod's report that she had used marijuana. But the fact is that the ALJ identified other reasons to discount Dr. Bowe's opinion that are supported by Ms. McLeod. And in the face of two other reasons, indications that Dr. Bowe's relied heavily on McLeod's reports rather than her own findings, as well as indications that Dr. Bowe's opinion is just not consistent with the record of evidence, it's reasonable to, or it's proper to find that the ALJ's decision is supported by substantial evidence, notwithstanding that one error. So, let's go to the second reason that the ALJ could discount Dr. Bowe's opinion that is not the most consistent with evidence. Again, Dr. Bowe discussed these severe and large limitations about McLeod's ability to communicate, maintain appropriate behavior, fulfill new tasks. But the evidence shows that McLeod has been quite active working during the relevant 30 days of her time, going out in public, maintaining friendships, living with her husband, etc. So, the ALJ gave two valid reasons supported by substantial evidence to discount Dr. Bowe's opinion. I want to briefly turn, unless there are any further questions about Dr. Bowe's opinion, I want to briefly turn to Dr. Hopke's opinion. The ALJ also gave two valid reasons to discount that opinion. The first is that Dr. Hopke assessed limitations that were just too broad and un-detailed to be useful in formulating the residual functional capacity. Dr. Hopke said that McLeod's prognosis guarded, that her psychosocial structures and memory functioning would, quote, challenge her ability to work, that her memory would adversely impact vocational retraining. But these assessments are just too broad and vague and don't provide enough detail as to what McLeod could and could not do. And as this court indicated in Ford, published this year, an ALJ properly discounted an opinion that's inadequate for determining the RLC. The ALJ also properly discounted Dr. Hopke's ultimate opinion that McLeod couldn't return to work. Because it's an administrative finding, the commissioner and the ALJ instead relied upon the agency opinion, which reviewed the record, including Dr. Hopke's defining and assessed limitations that were too broad and un-detailed to be useful in formulating the residual functional capacity. So I will close by stating that because the ALJ's findings are supported by substantial evidence, the court should affirm. Thank you. Thank you very much. Let's put a minute on the clock for rebuttal. Thank you. And the first thing I wanted to address is this statement that McLeod made to her therapist that she had not been fully honest. That's all we know. We don't know what it was about. We don't know if it was maybe it was about the past use of dry zone. We don't know exactly what. There's definitely something that said it, but we don't know what it is. And that's part of the reason I am not and I have not been requesting the payment of benefits because there is some uncertainty in this file that needs to be resolved. But the government's bringing that up in this case is truly a post hoc rationale, both because it was that evidence was not before the ALJ and the ALJ never mentioned it, obviously never mentioned it in her decision because it wasn't before the ALJ. Can you respond to the government's argument that there's no through lines from Dr. Bow's objective findings and her findings of limitations? That's ridiculous. There's so many clinical objective findings. It's one thing to say she was cooperative. She came into the room and tried to and communicated. That doesn't tell us that she could do so in a work environment. And all of those other clinical findings, which we're sitting here talking about, we're looking at paper and seeing the description. Dr. Bow's sat in a room for an hour two times with McLeod and observed her having all of these obvious, she recorded her observations of how dysfunctional McLeod was in that room. That is totally consistent through this record. And I didn't mention it in this argument, but the lay evidence is also consistent with this. Unless you have any other questions, I'm done. Thank you very much, counsel. The matter is submitted for a decision. We thank both sides for your argument today. The next case on calendar. Thank you, counsel. Boylan versus Saul has been submitted on the
judges: Nguyen, Simon, Bumatay